STATE of Missouri,
Plaintiff–Respondent,

v.

Bruce KILGORE, Defendant–Appellant.

No. 69965.

Supreme Court of Missouri,
En Banc.

May 16, 1989.

As Modified on Denial of Rehearing
June 13, 1989.

Thomas J. Cotter, St. Louis, for defendant-appellant.

William L. Webster, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

COVINGTON, Judge.

Defendant Bruce Kilgore appeals from his conviction by jury of murder in the first

degree, § 565.020, RSMo 1986, robbery in the first degree, § 569.020, RSMo 1986, and kidnapping, § 565.110, RSMo 1986. He was sentenced to death for the murder and to two consecutive terms of life imprisonment for the robbery and kidnapping. The judgment and sentence are affirmed.

## I

The murder victim, Marilyn Wilkins, age fifty-four, was employed at Cristos restaurant in St. Louis. On August 25, 1986, Willie Luckett, a co-worker of Ms. Wilkins, was fired by Cristos for stealing food after Ms. Wilkins advised management of the theft. Defendant Bruce Kilgore was a friend of Willie Luckett.

On August 27, 1986, Kilgore, Luckett, and Luckett's girlfriend, Renee Dickerson, discussed a scheme to rob Ms. Wilkins. That evening, Kilgore and Luckett drove to the parking lot of Cristos in a borrowed car and waited for Ms. Wilkins to leave work. Ms. Wilkins emerged between 10:00 p.m. and 10:30 p.m. Before she could enter her car, Kilgore and Luckett pulled up beside her and Luckett forced her into their car. Kilgore, who was driving, proceeded to Kinloch, a city in St. Louis County. During the drive, Luckett held Ms. Wilkins face down in the back seat of the car. He then ordered her to remove her rings. Luckett was wearing a stocking mask but removed the mask when Ms. Wilkins recognized his voice. Once Ms. Wilkins identified Luckett, he told her that her life was over.

At Kinloch, Kilgore drove into a dark wooded alleyway and stopped the car. The victim pleaded for her life. According to Kilgore, while he sat in the car, Luckett dragged Ms. Wilkins out of the car, stabbed her in the neck, and threw her body in the bushes. Kilgore's statement was controverted by a homeowner whose window overlooked the alley; she testified that she saw two men lifting something from the trunk of their car. Ms. Wilkins died of a laceration of the throat, five and one-half inches wide by three and one-half inches deep, triangular in shape, which severed the jugular veins on both sides of her neck and caused severe damage to the tra-chea. She also suffered several other stab wounds to the neck and back. The two small fingers of Ms. Wilkins' right hand were cut to the bone, consistent with defense wounds.

At approximately 11:00 p.m., Kilgore and Luckett arrived at Continental Can in St. Louis County to pick up a friend of Kilgore's from work. While they were waiting in the parking lot, Luckett broke the murder knife and threw away the pieces. Kilgore and Luckett then drove back to Luckett's house in Kinloch; the police arrived shortly thereafter. They questioned Luckett but did not arrest him at that time. Kilgore left the house through the back door before he could be questioned.

The next day, August 28, 1986, Kilgore, Luckett, and Luckett's cousin, Lessie Vance, drove to area pawn shops. They sold two of Ms. Wilkins' rings and unsuccessfully attempted to sell three others. Kilgore and Luckett divided the proceeds from the sale. That evening, Kilgore and Luckett decided to move the body because it was too close to Luckett's residence in Kinloch. They stuffed Ms. Wilkins' body in the trunk of Luckett's car and dumped it on a hill near the Art Museum in Forest Park. The body was discovered on August 29. Kilgore and Luckett were arrested on September 3. Kilgore made statements concerning the murder to the police. The statements were admitted at trial.

In the penalty phase of trial, the state adduced defendant's prior convictions for three counts of second degree robbery and first degree tampering. The state also presented the testimony of Renee Dickerson, who testified that Kilgore admitted that he slashed the victim's throat. Defendant called various friends and relatives in mitigation of punishment. The jury returned a sentence of death upon the defendant, finding as bases for capital punishment that the defendant murdered Marilyn Wilkins for the purpose of receiving money and other things of monetary value from the victim, that the murder was committed for the purpose of avoiding a lawful arrest, that the murder was committed in the perpetration of robbery and kidnapping,

and that the killing was outrageously or wantonly vile, horrible or inhuman in that it involved torture or depravity of mind. The defendant was also sentenced as a persistent offender to two consecutive terms of life imprisonment for first degree robbery and kidnapping.

## II

Defendant contends the trial court erred in overruling his motion to suppress statements made to the police and in admitting the statements at trial because the statements were the product of an illegal and pretextual arrest.

Defendant was arrested on September 3, 1986, at approximately 10:00 a.m. in St. Louis County by St. Louis City police on a charge of escaping from the custody of a correctional institution in St. Louis County. After being advised of his *Miranda* rights, the defendant told the officers under questioning that he had no knowledge of the murder of Marilyn Wilkins and that he had spent the evening with Willie Luckett at Luckett's home. Defendant was taken into custody in St. Louis City but was not further questioned that day.

The next morning, based on information obtained from Willie Luckett, warrants were issued against the defendant on charges of first degree murder, first degree robbery, and kidnapping. At approximately 8:30 a.m., after readvising the defendant of his rights, officers informed the defendant of the warrants. Defendant then admitted his involvement in the robbery of Ms. Wilkins and admitted having been present at the scene of her murder, but denied participation in the murder. Later that day, the defendant detailed and reenacted his participation in the crime in a videotaped confession. During the taping of the confession, officers readvised the defendant of his *Miranda* rights at least four times.

■ The state concedes that Kilgore's arrest in the county was unlawful because the St. Louis City police exceeded their limited powers of arrest under § 84.090(10), RSMo 1986. The question is, therefore, whether the "causal chain" be-

tween the arrest and the defendant's subsequent statements was broken by intervening events and whether the defendant's statements were "sufficiently an act of free will to purge the primary taint." *Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975); *State v. Reynolds*, 619 S.W.2d 741, 746 (Mo.1981). Whether a confession is a product of free will is a question to be determined on the facts of each case. *Brown*, 422 U.S. at 603, 95 S.Ct. at 2261. Factors to be considered by the court in making this determination are: (1) the issuance of *Miranda* warnings; (2) the temporal proximity of the arrest and the confession; (3) the presence of intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. *Brown*, 422 U.S. at 603–04, 95 S.Ct. at 2261–62; *Reynolds*, 619 S.W.2d at 747.

■ Here, with respect to the statements the defendant gave on September 4, the causal chain was broken. First, the defendant was advised of his *Miranda* rights on at least six different occasions during questioning. Second, with regard to temporal proximity, several hours have been deemed sufficient to purge the taint, *Reynolds*, 619 S.W.2d at 747, as has as little as forty-five minutes. *Rawlings v. Kentucky*, 448 U.S. 98, 107, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980). In the present case, each of the defendant's statements of September 4 was made almost a full day after his arrest. Third, a significant intervening circumstance occurred between the time of Kilgore's arrest and the time he made his statements: Kilgore was officially charged with murder, robbery, and kidnapping and was notified of these charges. A similar intervening circumstance occurred in *Reynolds*, 619 S.W.2d at 747, where police officers informed the defendant that the results of their investigation established that defendant was not being truthful about his activities. In *Reynolds*, as in this case, the defendant's statements were made in response to the knowledge that he faced serious legal difficulties. Finally, even if the purpose of the arrest be considered pretextual, this fact alone is not

sufficient to taint an otherwise voluntary confession. The taint of a pretextual arrest can be purged by subsequent events occurring prior to interrogation. *United States v. Lame,* 716 F.2d 515, 519 (8th Cir.1983). The notice to Kilgore of the filing of official charges served to purge the taint. Based upon the foregoing factors, therefore, the causal link between the defendant's illegal arrest and the statements which he made to police on the day after his arrest was severed sufficiently to render the defendant's statements voluntary and admissible.

■■■ As for the defendant's statement of September 3, that he had no knowledge of the murder of Marilyn Wilkins and that he spent the evening with Willie Luckett at Luckett's home, even if the statement were inadmissible, the error was harmless. Error will be declared harmless only if it is harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *State v. Miller,* 650 S.W.2d 619, 621 (Mo. banc 1983). The record reflects overwhelming evidence that Kilgore was with Luckett on the night of the murder. This fact was established through other statements from Kilgore and through the testimony of police officers. Defense counsel admitted the fact in closing argument. The fact was undisputed and did not influence the result in the case. The error was harmless beyond a reasonable doubt. The trial court properly declined to suppress Kilgore's statements.

### III

Defendant contends that the trial court erred in failing to find a discriminatory purpose in the state's peremptory strikes during jury selection.

■■■ Under *Batson v. Kentucky,* 476 U.S. 79, 96–98, 106 S.Ct. 1712, 1722–24, 90 L.Ed.2d 69 (1986), a defendant establishes a *prima facie* case of racial discrimination by showing that: (1) defendant is a member of a cognizable racial group; (2) the prosecutor has exercised peremptory challenges to remove members of the defendant's race from the venire; and (3) that "these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude venire persons from the petit jury on account of their race." *Batson,* 476 U.S. at 96, 106 S.Ct. at 1723. Once the defendant makes a *prima facie* showing, the burden shifts to the state to come forward with neutral explanation for challenging the jurors in question. This Court expanded upon *Batson* in *State v. Antwine,* 743 S.W.2d 51, 64 (Mo. banc 1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988), by requiring that the trial court consider the prosecutor's explanations for peremptory strikes in the process of determining the existence of the third element of the *prima facie* case.

In the present case, the trial court found that the defendant's *Batson* motion was not timely made but, nevertheless, considered the issue on its merits. The trial court appears to have found that the defendant made a *prima facie* case of racial discrimination, but the trial court also found that the state had sufficient justification for striking five blacks from the venire. Defendant is black. The victim was black. Some of the state's witnesses were black. After challenges for cause, the venire consisted of twenty-seven whites and seven blacks. The prosecutor peremptorily struck four whites and five blacks. Defendant used two peremptory strikes against blacks.

■■■ This Court reviews the substantive findings of the trial court. The trial court's findings as to whether the prosecutor discriminated in the exercise of his peremptory challenges will be set aside by a reviewing court only if clearly erroneous. *Antwine,* 743 S.W.2d at 66. A finding is clearly erroneous only when the reviewing court is left with a definite and firm impression that a mistake has been committed. *Id.*

■■■ The trial court's finding that the prosecutor had sufficient reasons for striking five black panel members is substantiated by the record, which reflects legitimate, non-pretextual, neutral explanations for the state's peremptory challenges. Ve-

nire person Yvonne Johnson had a close relative charged with a violent crime. Venire member Darren Mack's brother was convicted of assault with a deadly weapon. The prosecutor also believed that panel members Johnson and Mack gave weak responses regarding whether they could fairly consider a sentence of death. Venire person Darlene Davis was struck because, although she listened to questions about the death penalty during the entire morning session of voir dire and had an opportunity to think about the issue over lunch, she nevertheless stated that she had not thought about the death penalty. Venire member Davis was also struck because she gave weak and equivocal responses to questions regarding her ability to consider the death penalty, and because of her demeanor. Panel member Thrasa Carbin was struck because her brother worked in a correctional institution, and the prosecutor evaluated her answers to be weak on her ability fairly to consider the death penalty. Venire person Brenda Crigler was struck because she had seen the victim's son, a homosexual transvestite, on television and on the streets. The prosecutor stated that he personally had seen the son on the street "in his act" and he believed that Ms. Crigler's knowledge of the son's activities might affect her ability to consider fairly the testimony of the son, a state's witness.

█ In his argument, the defendant notes that panel members Carbin, Johnson, Mack, and Davis all stated that they could impose the death penalty, and, thus, the prosecutor's argument that these people gave "weak" death penalty responses is not plausible. Under *Batson,* however, the state is not required to establish that its grounds would warrant excusal for cause. *Batson,* 476 U.S. at 97, 106 S.Ct. at 1723. The prosecutor is permitted to exercise challenges on the basis of his legitimate "hunches" and past experiences so long as racial discrimination is not the motive. *Antwine,* 743 S.W.2d at 65. The ruling of the trial court was not clearly erroneous.

## IV

Defendant contends that the trial court erred in denying defendant's motion for a bifurcated jury.

█ The trial court did not err in denying defendant's request for a bifurcated jury. The United States Supreme Court has rejected the contention that the death qualification of a jury panel in a bifurcated trial produces a jury that is conviction prone. *See, Lockhart v. McCree,* 476 U.S. 162, 173, 106 S.Ct. 1758, 1764, 90 L.Ed.2d 137 (1986). Missouri's statutory scheme which provides for a single jury to determine guilt and punishment in a bifurcated trial is not constitutionally defective. *State v. O'Neal,* 718 S.W.2d 498, 502 (Mo. banc 1986), *cert. denied,* 480 U.S. 926, 107 S.Ct. 1388, 94 L.Ed.2d 702 (1987). The failure to provide a bifurcated jury does not deprive a defendant of a fair and impartial jury. *State v. Roberts,* 709 S.W.2d 857, 868 (Mo. banc 1986), *cert. denied,* 479 U.S. 946, 107 S.Ct. 427, 93 L.Ed.2d 378 (1986).

Defendant further alleges trial court error in refusing an instruction which he requested be given to the jury prior to voir dire. The instruction reads as follows:

You are cautioned that any questions directed to you at this time by the court and the attorneys regarding the death penalty being requested by the state does not create an inference that any offense was committed nor that the defendant is guilty of an offense.

█ Defendant's tendered instruction stands for the proposition that death qualification questions do not infer guilt. *MAI–CR 3d 300.02,* which was read to the jury, states that the charge of any offense creates no inference that any offense was committed or that the defendant is guilty of any offense. The instruction further states that a defendant is presumed to be innocent unless and until found guilty by the jury. The proposition that death qualification questions do not infer guilt is implicit in the statement contained in *MAI–CR 3d 300.02.* Whenever there is an *MAI–CR* instruction applicable under the law, that instruction shall be given to the exclusion of any other instruction. *Rule 28.02(c).* The defendant's proposed instruction was, therefore, properly refused.

## V

Defendant contends that the trial court erred in denying defendant's motion to sever the offenses.

The substitute information in lieu of indictment charged defendant, as a prior and persistent offender, with murder first degree, robbery first degree, and kidnapping. All charges were tried together pursuant to § 565.004.3, RSMo 1986, which provides that a defendant may be tried jointly for first degree murder and other offenses if he "has been charged and proven before trial to be a prior offender pursuant to chapter 558, RSMo, . . . ." The trial court conducted a hearing on the sixth day of trial at which time the state proved that the defendant was a prior offender.

 Procedural errors in prior offender hearings do not warrant reversal unless the defendant is shown to have been prejudiced. *State v. Wynn*, 666 S.W.2d 862, 864 (Mo.App.1984). The failure to prove the defendant's status as a prior offender before trial was procedurally defective but did not result in prejudice to the defendant. The hearing on prior offenses showed undisputably that the defendant was a prior offender. Any retrial of the charges against the defendant would result in a similar consolidation.

Defendant contends that, had he known prior to trial that the state would be able to prove him a prior offender, he may have accepted the state's offer to plead guilty to first degree murder and receive life imprisonment. Defendant's contention is not plausible. Defendant was aware that he was being tried as a prior offender. The information listed prior convictions for second degree robbery and first degree tampering, and these convictions were discussed in the defendant's presence prior to trial. Additionally, the record reflects that the defendant rejected the state's plea bargain offer after the trial court denied the motion to sever. Defendant then knew that he would be tried jointly for all offenses but nevertheless decided to proceed to trial.

Joinder of the offenses pending against defendant was proper. The failure to prove prior offender status prior to trial was harmless error and did not affect substantial rights. *Rule 29.12(a)*.

## VI

Defendant attempts to challenge the constitutionality of *Rule 29.15(m)* as it "relates to the schedule for filing a motion for post-conviction relief where sentence is pronounced prior to January 1, 1988."

Without reference to the record before this Court, the defendant recites in his brief certain dates and events which, if correct, indicate that the defendant failed to file timely a motion for post-conviction relief under *Rule 29.15*. In his brief, the defendant states that he now seeks to preserve the issue of the constitutionality of the rule.

Defendant does not state the basis for his constitutional attack. He does not specify the provisions of the federal or state constitution which he claims the rule violates. The Court, consequently, will not consider the defendant's allegation of unconstitutionality. *Rule 30.20*.

## VII

Defendant's next contention is that the trial court erred in permitting the state to present the testimony of Renee Dickerson in the penalty phase of trial. Defendant claims that Dickerson's testimony should have been excluded because: (1) prior to trial, the prosecutor orally advised defense counsel that Dickerson would not be called as a witness; (2) Dickerson was not timely endorsed as a witness by the state; and (3) the state failed to provide defense counsel with a report detailing the ways in which Dickerson's testimony would vary from prior statements she had made to police.

On April 27, 1987, four months prior to trial, defense counsel sought to depose Renee Dickerson. At that time the prosecutor informed counsel that Dickerson would not be offered as a witness for the state. The state did not intend to put Dickerson on the stand because she was charged with criminal offenses relating to this incident and had refused to testify at trial. Since

Dickerson did not intend to testify, the state did not endorse her as a witness prior to trial.

At some point during trial, the charges against Dickerson were disposed of, and she indicated to the prosecution that she would be willing to testify. On Saturday, August 22, during the guilt phase of trial, the prosecutor notified defense counsel that Dickerson might be called as a rebuttal witness in the guilt phase or as a witness in the penalty phase. Two days later, on Monday, August 24, Dickerson was formally endorsed as a penalty phase witness. Later that day, the trial court ordered that Dickerson be made available to the defense for an interview. The next morning, shortly before the penalty phase was set to begin, defense counsel spoke with Dickerson and was also advised by the state of the substance of Dickerson's anticipated testimony.

On the witness stand, Dickerson testified that Kilgore admitted in her presence that he slit the victim's throat. The relevant testimony is as follows:

Q: All right. Did they [Bruce Kilgore and Willie Luckett] come back together?

A: Yes.

Q: When they came back, what happened?

A: Willie woke me up and he said that the lady was dead, and I told him he was lying, and he said yes, that Bruce had cut his neck—cut her neck. And I looked up to Bruce for him to answer me and he said, "yeah".

Dickerson was interviewed on three prior occasions by the police. Although she stated to the police on those occasions that Willie Luckett told her that Kilgore did the killing, she did not mention that Kilgore admitted doing the killing. This admission was revealed for the first time during Dickerson's testimony.

 Contrary to the defendant's argument, the prosecutor did not engage in misconduct which would justify exclusion of Dickerson's testimony at trial. A prosecutor may not convey incorrect or misleading information to a defendant. *State v.*

*Collor,* 502 S.W.2d 258, 260 (Mo.1973). The prosecutor did not attempt to mislead the defendant, however, when he told defense counsel prior to trial that he did not intend to call Renee Dickerson to the stand. At that time, the state believed that Dickerson would not testify. The state did not prevent defense counsel from deposing Dickerson although it appears unlikely that Dickerson would have been willing to answer deposition questions when she was under indictment and fearful of incriminating herself. The prosecutor did not engage in misconduct which would justify excluding Dickerson's testimony at trial, and the defendant offers no other legal theory to justify excluding the evidence based upon the prosecutor's representation.

Defendant next asserts that the state failed timely to endorse Dickerson as a witness. Defendant relies upon § 565.005.1, RSMo 1986, which states in pertinent part:

At a reasonable time before the commencement of the first stage of any trial of murder in the first degree at which the death penalty is not waived, the state and defendant, *upon request* and without order of the court, shall serve counsel of the opposing party with: ... (2) The names of all persons whom the party intends to call as witnesses at the second stage of the trial; .... (emphasis added).

 The state did not notify the defendant before the trial that it intended to call Renee Dickerson as a penalty phase witness. Defendant, however, failed to request the names of the state's penalty phase witnesses. Failure to make the required request for disclosure under § 565.005.1, absolves the state from the duty to comply with the notice provisions of that section. *State v. Mallett,* 732 S.W.2d 527, 537 (Mo. banc 1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987). In any event, even had the defendant timely requested the names of penalty phase witnesses, the state did not then expect Dickerson to testify, thus, her name would not have been disclosed. Since the provisions of the statute were not

violated, there is no basis for excluding Dickerson's testimony on this ground.

It appears possible, however, that the state violated Missouri discovery rules by failing to notify the defense of the substance of Dickerson's, testimony as it related to the oral admission by the defendant. On September 19, 1986, pursuant to *Rule 25.03,* the defendant requested discovery of the substance of any oral statements made by the defendant. At the time, the state was unaware of Dickerson's statement regarding Kilgore's oral admission. At some point during the trial, however, the prosecutor discovered that Dickerson would agree to testify. The record does not reveal precisely when the prosecutor first learned of the complete substance of Dickerson's testimony.

Even assuming that the state violated *Rule 25.03,* this Court is not automatically required to find that the trial court abused its discretion in permitting Dickerson's testimony. The question of the remedy for violation of the discovery rule lies within the sound discretion of the trial court. A trial court's denial of a requested sanction is an abuse of discretion only where the admission of the evidence results in fundamental unfairness to the defendant. *State v. Royal,* 610 S.W.2d 946, 951 (Mo. banc 1981). "The notion of fundamental unfairness in turn is to be measured by whether the evidence or the discovery thereof would have affected the result of the trial." *Id.*

*Royal* requires a showing that the nondisclosure of the evidence affected the outcome of the trial. *State v. Couch,* 569 S.W.2d 789, 791 (Mo.App.1978), relied on by this Court in *Royal,* held that "[i]f the evidence was not of such a character as to raise a reasonable likelihood that its prior discovery would have affected the result of the trial, there is no error for failing to

impose sanctions *for its nondisclosure."* *Id.* (emphasis added). The primary focus, therefore, is on the effect of nondisclosure on the outcome of trial.[1]

To focus upon the effect of nondisclosure is reasonable and logical. The basic object of the discovery process is to permit the defendant a decent opportunity to prepare in advance of trial and avoid surprise. *State v. Sykes,* 628 S.W.2d 653, 656 (Mo.1982); *State v. Johnson,* 524 S.W.2d 97, 101 (Mo. banc 1975). Where defense counsel has not had an opportunity to examine the state's evidence in advance of trial, that evidence is justly excluded if counsel can show that the outcome of the trial would have been different had he been able to prepare to meet that evidence. Where counsel is surprised by opposing evidence at trial, however, but deals with that evidence in precisely the same manner as if he had been fully prepared, there is no reason to exclude that evidence, however significant, based on a discovery violation. A lack of disclosure in such a case has no effect on the result of trial.

In his trial objection and in his motion for a new trial, the defendant claims prejudice through surprise. Defendant does not claim, however, that he would have done anything differently had the state disclosed the information earlier. At trial, counsel cross-examined Renee Dickerson extensively. He impeached her testimony by forcing her to admit that, when she was questioned earlier by police, she failed to mention that Kilgore admitted killing the victim. Counsel called a police officer to the stand to confirm this fact. Counsel brought up the fact that Dickerson was Willie Luckett's girlfriend and likely to be biased. Dickerson admitted that she had been awake for only a short time when Kilgore made his alleged statement. It is evident that counsel did not believe that he could do any-

---

1. Other cases that support this view are *State v. Johnson,* 702 S.W.2d 65, 73 (Mo. banc 1985) (Inquiry is whether the state's discovery violation substantively altered the outcome of the case); *State v. Foulk,* 725 S.W.2d 56, 69 (Mo. App.1987) (Fundamental unfairness is measured by whether the earlier discovery of the evidence would have likely affected the result of trial);

*State v. Arnette,* 686 S.W.2d 4, 7 (Mo.App.1984) (To find fundamental unfairness it must appear that prior discovery would have affected the result of trial); and *State v. Mansfield,* 668 S.W.2d 271, 273 (Mo.App.1984) (Defendant must show that the failure to produce the evidence earlier resulted in fundamental unfairness or prejudice).

thing further to impeach Dickerson's testimony because counsel did not seek a continuance after having been notified that Dickerson would testify. Counsel does not now postulate that any additional time would have afforded the defendant an opportunity of which he has not already availed himself.

There is no question that the testimony of Renee Dickerson was important. The oral admission of Kilgore, to which Dickerson testified, is the only direct evidence that Kilgore actually held the knife. Defendant implies that Dickerson's testimony affected the result of the trial in that her testimony was responsible for imposition of the death penalty. While any incriminating evidence is "prejudicial," *State v. Shaw,* 636 S.W.2d 667, 672 (Mo. banc 1982), *cert. denied,* 459 U.S. 928, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982), this Court has previously concluded that the pertinent inquiry is whether the *failure to disclose* Dickerson's testimony affected the result of the trial. Within the meaning of *State v. Royal,* failure to disclose the substance of Dickerson's testimony cannot be said to have affected the result of the trial, and the admission of the evidence, therefore, did not result in fundamental unfairness.

■ As a part of this point, and for the first time, defendant cursorily suggests that an element of fundamental unfairness exists in the fact that the state's evidence during the guilt phase was that Willie Luckett, rather than Kilgore, inflicted the wound that caused Marilyn Wilkins' death, whereas in the penalty phase Dickerson testified that Kilgore slit Marilyn Wilkins' throat. The defendant did not preserve this claim of error. He objected to the testimony of Dickerson at trial on the basis of surprise. He did not raise at trial or in his new trial motion the argument that Dickerson's penalty phase testimony was inadmissible because it was inconsistent with the prosecutor's theory in the guilt phase or that it was inconsistent with the jury instructions. An appellant cannot broaden the scope of his objection on appeal beyond that raised in the trial court. *State v. Hanson,* 735 S.W.2d 100, 103 (Mo.

App.1987). As for plain error review under *Rule 30.20,* the defendant does not present argument in support of his bare assertion and, thus, has failed to meet his burden of proving that the alleged error amounted to manifest injustice or a miscarriage of justice. *See, State v. Hubbard,* 659 S.W.2d 551, 556 (Mo.App.1983).

Notwithstanding the defendant's mere mention of the inconsistency of the evidence presented in the guilt and penalty phases, the Court has given the question full consideration as if the point had been properly preserved. This review, *ex gratia,* reveals no element of fundamental unfairness, however disquieting the inconsistent presentation of the evidence might be. To reiterate, the record reflects no prosecutorial misconduct, within the meaning of *State v. Collor,* 502 S.W.2d 258, to justify exclusion of Dickerson's testimony. Dickerson's testimony in the penalty phase was the result of what appears simply to be an unusual confluence of events related to the timing of the plea bargain disposition of Dickerson's own criminal case and the termination of the guilt phase of Kilgore's trial. Dickerson's testimony was not irrelevant. There is no showing that the defendant was prejudiced by surprise. Consequently, there is no lawful basis upon which to exclude the testimony.

After consideration of each of the defendant's assertions on the appeal and after independent review, this Court finds no prejudice nor fundamental unfairness within the meaning of *State v. Royal* with respect to the trial court's admission of Renee Dickerson's testimony.

## VIII

■ Defendant contends that the trial court erred in refusing to submit the defendant's proposed Instruction B in the penalty phase. Following the language of *Enmund v. Florida,* 458 U.S. 782, 797, 102 S.Ct. 3368, 3376–77, 73 L.Ed.2d 1140 (1982), the instruction stated:

The Eighth Amendment of the United States Constitution forbids the imposition of the death penalty on a person who aids a felony in the course of which a

murder is committed by another, but who does not himself kill, attempt to kill, or intend that a killing take place or that deadly force will be employed.

The dictates of *Enmund* do not apply. To be convicted of a capital crime in Missouri, one must knowingly cause the death of another after deliberation, § 565.020.1, RSMo 1986, or with the purpose of promoting the commission of the murder, aid, agree to aid, or attempt to aid another in planning, committing, or attempting to commit the murder, § 562.041.1(2), RSMo 1986. The verdict-directing instruction in this case followed the language of § 562.041.1(2). The jury found that with the purpose of promoting or furthering the death of Marilyn Wilkins, the defendant aided or encouraged Willie Luckett in causing the death of Marilyn Wilkins. Acting with the purpose of promoting or furthering the death of another satisfies the intent requirements of *Enmund*. *State v. Byrd*, 676 S.W.2d 494, 507 (Mo. banc 1984). Since the defendant was convicted of first degree murder in the guilt phase only after the jury found an intent to kill, defendant's proposed penalty phase instruction was irrelevant. The trial court did not err in refusing to submit the instruction.

## IX

This Court is required by § 565.035.3, RSMo 1986, to conduct an independent review of all death sentences.

■ The Court must first determine whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. § 565.035.3(1), RSMo 1986. The defendant does not point to any arbitrary factors that influenced the sentence. After independent review, this Court finds no evidence that the death sentence was imposed under the influence of passion, prejudice, or other arbitrary factors. This Court has previously rejected the defendant's assertion that the death penalty constitutes cruel or unusual punishment. *See, e.g., State v. Schneider*, 736 S.W.2d 392, 404 (Mo. banc 1987); *State v. Johns*, 679 S.W.2d 253, 267

(Mo. banc 1984), *cert. denied*, 470 U.S. 1034, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985).

■ This Court must next determine whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in subsection 2 of § 565.032, RSMo 1986, and any other circumstance found. § 565.035.3(2), RSMo 1986. A finding of only one aggravating circumstance is sufficient to support the death penalty. *Schlup v. State*, 758 S.W.2d 715, 716 (Mo. banc 1988). The trial court submitted to the jury six aggravating circumstances, and the jury cited all of them when it returned its sentence. The jury found the following statutory aggravating circumstances: (1) The defendant murdered Marilyn Wilkins for the purpose of receiving money or any other thing of monetary value from Marilyn Wilkins. *See*, § 565.032.2(4), RSMo 1986. (2) The murder of Marilyn Wilkins was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest. *See*, § 565.032.2(10), RSMo 1986. (3) The murder of Marilyn Wilkins was committed while the defendant was engaged in the perpetration of robbery and kidnapping. *See*, § 565.032.2(11), RSMo 1986. (4) The murder of Marilyn Wilkins involved torture or depravity of mind and as a result thereof was outrageously or wantonly vile, horrible, or inhuman. *See*, § 565.032.2(7), RSMo 1986.

■ Although defendant asserts in his Point Relied On that the statutory aggravating circumstances were not supported by the evidence, he offers no argument in support of his point. Moreover, contrary to the defendant's assertion, there is substantial evidence in the record to support each of the statutory aggravating circumstances. Evidence of the planning of the robbery and that Kilgore produced pieces of Ms. Wilkins' jewelry from his pocket was sufficient for the jury to believe that Ms. Wilkins was murdered for the purpose of obtaining her valuables. Evidence that, immediately after Ms. Wilkins recognized Willie Luckett, she was told her life was over, supports a finding that the murder was committed to avoid a lawful

arrest. That the murder was committed during a robbery and kidnapping is unchallenged and is shown by the fact that Ms. Wilkins was forced into the back seat of the defendant's car, driven to Kinloch, and robbed of her jewelry. There is substantial evidence that the murder involved both physical and psychological torture: Marilyn Wilkins was forced face-down onto the floor of the car while Luckett held her down; she was forced to remain hunched over in this position while the defendant drove from St. Louis to Kinloch during which time Marilyn Wilkins was told that she was going to die. Ms. Wilkins pleaded for her life, and she had a substantial period of time before death to anticipate and reflect upon her death. Ms. Wilkins' killing was brutal by means of slashing her throat. She suffered multiple stab wounds, and she was dumped in a deserted alley to bleed to death.

The jury found two additional aggravating circumstances: (1) the defendant pled guilty to tampering first degree on March 1, 1984; and (2) the defendant pled guilty to robbery on June 29, 1979. Both of these aggravating circumstances were supported by competent evidence on the record.

Finally, the Court must consider whether the sentence imposed is excessive or disproportionate to the penalty imposed in similar cases, considering the crime, the strength of the evidence, and the defendant. § 565.035.3(3), RSMo 1986. The record shows that the defendant was twenty-six years of age at the time of the commission of the crime. In the trial judge's report required by § 565.035.1, RSMo 1986, the judge assessed the defendant's intelligence as average. Friends and relatives of the defendant testified on his behalf and requested that his life be spared. The trial court submitted four mitigating circumstances to the jury: (1) The defendant has no significant history of prior criminal activity. *See*, § 565.032.3(1), RSMo 1986. (2) The defendant was an accomplice in the murder of Marilyn Wilkins and his participation was relatively minor. *See*, § 565.032.3(4), RSMo 1986. (3) The defendant acted under extreme duress or under substantial domination of another person.

*See*, § 565.032.3(5), RSMo 1986. (4) The age of the defendant at the time of the offense. *See*, § 565.032.3(7), RSMo 1986. After learning that the defendant had decided not to testify in the penalty phase, the trial court, in attempting to ensure that the defendant understood the significance of his decision not to testify, commented that there was no competent evidence of mitigating circumstances in the record. This Court agrees. The defendant had prior criminal activities that could not be deemed insignificant. The defendant's role in the murder was far from minor. Nothing indicates that the defendant was particularly subject to the control of others or acted under extreme duress. In fact, there is no evidence in the record to suggest that the defendant performed any of his roles in the crimes other than willingly. The trial judge in his report commented that the punishment fit the nature of the crime.

■ In reviewing the capital cases similar to the instant one where both death and life imprisonment were submitted to the jury, the Court concludes that the defendant's sentence was neither disproportionate nor excessive. Death sentences have repeatedly been affirmed in cases involving the gratuitous killing of a robbery victim. *See, e.g., State v. Griffin*, 756 S.W.2d 475 (Mo. banc 1988); *State v. Walls*, 744 S.W.2d 791 (Mo. banc 1988), *cert. denied*, — U.S. —, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988); *State v. Murray*, 744 S.W.2d 762 (Mo. banc 1988), *cert. denied*, — U.S. —, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988); *State v. Gilmore*, 681 S.W.2d 934 (Mo. banc 1984); *State v. Johns*, 679 S.W.2d 253 (Mo. banc 1984), *cert. denied*, 470 U.S. 1034, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985); *State v. Battle*, 661 S.W.2d 487 (Mo. banc 1983), *cert. denied*, 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984); *State v. Laws*, 661 S.W.2d 526 (Mo. banc 1983), *cert. denied*, 467 U.S. 1210, 104 S.Ct. 2401, 81 L.Ed.2d 357 (1984). Death sentences have also been affirmed in cases in which the murder victim was kidnapped. *State v. Blair*, 638 S.W.2d 739 (Mo. banc 1982), *cert. denied*, 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1030 (1983), and in cases

where the victim was killed to avoid identification, *See, State v. Foster*, 700 S.W.2d 440 (Mo. banc 1985), *cert. denied*, 476 U.S. 1178, 106 S.Ct. 2907, 90 L.Ed.2d 993 (1986); *State v. Battle*, 661 S.W.2d 487. Nothing indicates that the defendant was a weakling or was especially subject to the control of others. *Cf. State v. McIlvoy*, 629 S.W.2d 333 (Mo. banc 1982).

Defendant contends that this case is distinguishable from other death penalty cases because he was an accomplice and his participation in the murder was relatively minor. The death penalty has been imposed in accomplice cases. *See, e.g., State v. Walls*, 744 S.W.2d 791; *State v. Foster*, 700 S.W.2d 440; *State v. Laws*, 661 S.W.2d 526; *State v. Johns*, 679 S.W.2d 253. The evidence shows that the defendant helped to plan the robbery of Marilyn Wilkins, provided the car Ms. Wilkins was forced into, drove that car, participated in the alley when Ms. Wilkins was killed and her body disposed of, and then helped move the body to avoid detection. This Court concludes that the defendant's participation in the murder was similar to the level of participation found in other accomplice cases. Furthermore, there is competent evidence in the record that the defendant slit the victim's throat, and, therefore, was not an accomplice.

The Court finds that the defendant's death sentence is neither excessive nor disproportionate to the penalty imposed in similar cases considering the strength of evidence, the crime, and the defendant.

The judgment is affirmed.

BILLINGS, C.J., and WELLIVER, ROBERTSON, RENDLEN and HIGGINS, JJ., concur.

BLACKMAR, J., concurs in separate opinion filed.

BLACKMAR, Judge, concurring.

After much reflection, I have decided to concur in the principal opinion. I was initially disturbed at the state's changing theories between the guilt phase and the punishment phase of the trial, but on reflection am persuaded that the defendant was for all intents and purposes a principal. *Cf. State v. Laws*, 661 S.W.2d 526 (Mo. banc 1983). Prior to MAI–CR, the information could have been founded and the jury could have been instructed on the basis that the defendant was a principal. The jury could have accepted the defendant's admission that he was an active participant in the robbery, kidnapping and murder, without necessarily believing his claim that Luckett had wielded the knife. Under these circumstances I find no essential unfairness in providing the jury, at the punishment phase, with the additional information that he had admitted that he dealt the fatal blow. The principal opinion demonstrates convincingly that the defense had full opportunity to challenge and to impeach the testimony. On the whole, I perceive no error requiring reversal.

I doubt that I would be willing to uphold a conviction in a case in which I was persuaded that the prosecution had misled the defendant by change of theories. This is not such a case.

I am also concerned that another jury, in its wisdom, assessed life imprisonment after finding Willie Luckett guilty of first degree murder. *State v. Luckett*, 770 S.W.2d 399 (Mo.App.1989). The cases are distinguishable because Luckett sought to demonstrate by evidence that the killing was Kilgore's idea and that he, Luckett, did not wield the knife. A jury apprised of those facts might logically decree the lesser sentence. Also, no evidence of prior offenses was introduced in Luckett's case. I believe that this Court, in its proportionality review pursuant to § 565.035.3(1), should give attention to the fate of other participants in the same offense. *See State v. McIlvoy*, 629 S.W.2d 333 (Mo. banc 1982). But here the jury had a basis for drawing a distinction.

I concur in the principal opinion.